**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| CARLOS M. JAVALERA and | ) | |
| JESSICA R. JAVALERA, | ) | No. 18 B 22039 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| JACOB STRYJEWSKI, a minor, by his | ) | |
| mother Victoria Stryjewski, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18 A 882 |
| | ) | |
| CARLOS M. JAVALERA and JESSICA R. | ) | |
| JAVALERA, | ) | |
| | ) | |
| Defendants. | ) | Judge Goldgar |

**MEMORANDUM OPINION**

When Jacob Stryjewski was an infant, Jessica Javalera cared for him at a day care she ran in her home. Jacob spent only five days there. During that short time, Jacob began showing signs of "shaken baby syndrome." Jacob (through his mother, Victoria) later sued the Javaleras for his injuries in Illinois state court, prompting the Javaleras to file a chapter 7 bankruptcy case. He then sued again in the bankruptcy court. Jacob alleges that the Javaleras owe him a debt for a "willful and malicious injury" to his person, a debt nondischargeable under 11 U.S.C. § 523(a)(6).

The Javaleras have moved for summary judgment on the complaint. For the reasons discussed below, their motion will be granted.

## 1. Jurisdiction

The court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and the district

court's Internal Operating Procedure 15(a).  This is a core proceeding under 28 U.S.C.

§ 157(b)(2)(I).

## 2. Facts

The record discloses the following facts.  Because the parties' statements of fact under

L.R. 7056-1 and L.R. 7056-2 are so spare that they fail to tell a coherent story, other facts

evident from the record are considered.  *See* Fed. R. Civ. P. 56(c)(3); *see, e.g., Ayazi v. United*

*Fed'n of Teachers Local 2*, 487 F. App'x 680, 681 (2d Cir. 2012) (holding that a court can

consider evidence "not specifically cited" in the parties' papers).

Jessica Javalera and her husband Carlos live in Gurnee, Illinois.  (Aff. of J. Javalera ¶ 1,

Dkt. No. 94, Grp. Ex. H).  In 2016, Jessica provided day care services in her home to several

children.  (*Id.* ¶ 3).  One of them was Jacob Stryjewski (*id.* ¶ 3) who was then five months old

(D. Stryjewski Dep. at 10-11, Dkt. No. 101, Ex. 4).

Jessica had Jacob in her care for only five days:  Tuesday through Thursday, August 23-

25, 2016; Tuesday, August 30, 2016; and Tuesday, September 6, 2016.  (D. L.R. 7056-1 Stmt. ¶

1; P. L.R. 7056-2 Resp. ¶ 1).  On Mondays, Jacob's grandmother, Lorraine Krupica, cared for

him.  (Aff. of J. Javalera ¶ 4, Dkt. No. 94, Grp. Ex. H).  On the days Jacob spent in the Javalera

home, Jacob's father, Daniel, dropped him off around 7 a.m., and his mother, Victoria, picked

him up around 3:30 p.m.  (*Id.* ¶ 6).

On the days Jessica cared for Jacob, he cried often and vomited, particularly after

feedings.  (*Id.* ¶¶ 7-9).

Around August 31, Jacob was admitted to a local hospital.  (*Id.* ¶ 9).  A few days later,

Jacob was examined at Lurie Children's Hospital in Chicago. (DCFS Rept. at 4, Dkt. No. 103, Ex. E). A CT Scan revealed bilateral subdural hematomas and retinal hemorrhages. (*Id.* at 8). A physician at Lurie diagnosed the injuries as consistent with "shaken baby syndrome," or abusive head trauma. (*Id.*; *see also id.* at 64).[1] The physician did not suggest who might have caused Jacob's injuries. (*See id.*).

Someone, possibly the Lurie physician, must have reported the matter to the Illinois Department of Children & Family Services, because in early September DCFS began two investigations, one of Jessica Javalera and another of Daniel and Victoria Stryjewski. (D. L.R. 7056-1 Stmt. ¶ 24; P. L.R. 7056-2 Resp. ¶ 24). DCFS observed during its investigations that Jacob's injuries "could have occurred while the child was in the care of the parents or while the child was in the care of the babysitter." (DCFS Rept. at 41, Dkt. No. 103, Ex. E).[2]

After two months, DCFS ended the investigations, finding the initial report "indicated" because there was credible evidence of abuse but declaring the report "unfounded" because

---

[1]     The American Academy of Pediatrics prefers the broader term "abusive head trauma." *See People v. Schuit*, 67 N.E.3d 890, 915 n.3 (Ill. App. Ct. 1st Dist. 2016).

[2]     The Javaleras object to the admissibility of the DCFS Report as well as the statements in it from physicians and police officers. The Javaleras argue that the Report is not authenticated and is hearsay, and the statements of third parties are double hearsay. (D. Reply at 3-4). The Javaleras are right that Victoria has simply attached the Report without authenticating it under Rules 901 or 902 of the Federal Rules of Evidence. They are right, too, that the Report is hearsay under Rule 801(c), and the third-party statements in it are double hearsay under Rule 805. The Javaleras add that the Report is not admissible under the hearsay exception in Rule 803(6) as a record of regularly conducted activity, since Victoria has not even tried to lay the foundation for that exception. Whether the Report might still be admissible under the exception for public records in Rule 803(8) is a messy question that neither side addresses. Because none of these materials would help Jacob meet his summary judgment burden even if they were admissible, the better course is to consider them rather than try to cut a path through the evidentiary thicket. *See, e.g., JP Morgan Chase Bank, N.A. v. Jenkins*, No. 14 C 4278, 2016 WL 4417072, at *2 (N.D. Ill. Aug. 18, 2016) (considering inadmissible report on summary judgment because, inadmissibility aside, "it does not advance defendant's position"), *aff'd*, 771 F. App'x 673 (7th Cir. 2019).

DCFS could not identify a perpetrator.  (Aff. of J. Javalera ¶ 23, Dkt. No. 94, Grp. Ex. H; Aff. of

B. Solomon ¶ 10, Dkt. No. 94, Grp. Ex. I; DCFS Rept. at 72-73, Dkt. No. 103, Ex. E).  DCFS

sent Jessica Javalera a letter telling her of its determination.  (Ex. A to Aff. of J. Javalera, Dkt.

No. 94, Grp. Ex. H).  The letter said the determination meant "credible evidence of child abuse

or neglect was not found on your part."  (*Id.*). DCFS made no similar finding about Carlos

Javalera and sent him no letter because he had never been the subject of an investigation.  (Aff.

of B. Solomon ¶ 10, Dkt. No. 94, Grp. Ex. I).

In early September, DCFS had also notified the Gurnee Police Department that Jacob had

been admitted to Lurie with a head injury, and GPD began its own investigation.  (Police Rept. at

3, Dkt. No. 103, Ex. B).[3/]  In late October, a GPD detective told DCFS that charges in the matter

were unlikely because "an offender has not been identified"  (DCFS Rept. at 67, Dkt. No. 103,

Ex. E), and in early 2017 GPD closed its investigation (Police Rept. at 15, Dkt. No. 103, Ex. B).

No charges were brought against Jessica or Carlos Javalera relating to Jacob's injuries.  (Aff. of

J. Javalera ¶ 22, Dkt. No. 94, Grp. Ex. H; Aff. of C. Javalera ¶ 16, Dkt. No. 94, Grp. Ex. H).

During the five days in question, only the Javaleras, the Stryjewskis, and Lorraine

Krupica, Jacob's grandmother, cared for or had contact with Jacob.  (D. Stryjewski Dep. at 76,

Dkt. No. 101, Ex. 4).  The Javaleras both deny ever attacking, striking, or shaking Jacob and

injuring him.  (Aff. of J. Javalera ¶ 15, Dkt. No. 94, Grp. Ex. H; Aff. of C. Javalera ¶ 10, Dkt.

No. 94, Grp. Ex. H).  The Stryjewskis admit they never saw Jessica or Carlos attacking, striking,

or shaking Jacob, nor do they know of anyone who saw them do so.  (D. L.R. 7056-1 Stmt. ¶¶

15-19; P. L.R. 7056-2 Resp. ¶¶ 15-19).  For their part, the Stryjewskis also deny shaking,

---

[3/]      The GPD Report has the same problems with admissibility as the DCFS Report.
The GPD Report will be considered for the same reasons despite those problems. *Jenkins*, 2016
WL 4417072, at *2.

striking, or harming Jacob and insist Ms. Krupica did not harm him either.  (*See* V. Stryjewski Dep. at 93, Dkt. No. 101, Ex. 2).[4]

In 2018, Jacob (through Victoria) sued the Javaleras and another person (apparently the Javaleras' landlord) in Illinois state court over Jacob's injuries.  (Dkt. No. 1, Ex. 1).  The Javaleras then filed a chapter 7 petition, and Jacob (again through Victoria) sued the Javaleras in the bankruptcy case, alleging they owed him a debt nondischargeable under section 523(a)(6) of the Bankruptcy Code.

The Javaleras now move for summary judgment on Jacob's complaint.  They contend they did not cause his injuries, and he cannot prove they did.

### 3.  Discussion

Summary judgment is warranted here.  Jacob has adduced no evidence that would allow a reasonable fact-finder to conclude they caused him a willful and malicious injury under section 523(a)(6) and so owe him a nondischargeable debt.  Their motion will be granted.

### a.  Summary Judgment Standard

A party can obtain summary judgment – a judgment without trial, in other words – when there is no genuine dispute as to any material fact, and the party is entitled to judgment as a

---

[4]     Jacob asserts in his L.R. 7056-2 statement of additional facts that the Stryjewskis and Ms. Krupica all deny harming him.  (P. L.R. 7056-2 Stmt. of Add'l Facts ¶ 2).  For this fact, Jacob cites the Stryjewskis' depositions but gives no page numbers, and the Javaleras rightly object that they need not dig through the depositions to see if the asserted fact has support.  The court need not either, *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021), but has done so anyway, *see Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1017 (7th Cir. 2016).  Daniel Stryjewski never denied harming his son; he was never asked.  Victoria Stryjewski testified that neither she, her husband, nor her mother harmed her son.  (V. Stryjewski Dep. at 93, Dkt. No. 101, Ex. 2).  Problems with the depositions make little difference, though, because at trial the Stryjewskis and Ms. Krupica would deny harming Jacob.

matter of law.  Fed. R. Civ. P. 56(a) (made applicable by Fed. R. Bankr. P. 7056).  If no facts are disputed and the law dictates judgment for one side rather than the other, no trial is necessary. *Thomas v. Martija*, 991 F.3d 763, 768 (7th Cir. 2021).  The moving party bears the initial burden of showing that summary judgment is appropriate.  *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

When the defendant is the movant, he can meet that burden in two ways.  *Hummel*, 817 F.3d at 1015-16.  He can produce "affirmative evidence that negates an essential element of the [plaintiff's] claim," *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (internal quotation omitted), evidence consisting of "particular parts of materials in the record" such as depositions, documents, and affidavits, Fed. R. Civ. P. 56(c)(1)(A).  Or he can simply point out that "there is an absence of evidence to support [the plaintiff's] case," *Modrowski*, 712 F.3d at 1168 (internal quotation omitted); *see* Fed. R. Civ. P. 56(c)(1)(B).  Either way, once that initial burden is met, the plaintiff must come forward with evidence supporting judgment in his favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Otherwise, summary judgment for the defendant must be granted.  *Modrowski*, 712 F.3d at 1167.

The Javaleras have met their initial burden in both ways.  They have adduced evidence (mainly their affidavits) that they did not injure Jacob, Fed. R. Civ. P. 56(c)(1)(A), and they have pointed out that Jacob has no evidence showing they did.  Fed. R. Civ. P. 56(c)(1)(B).  Because the Javaleras have satisfied their burden, the burden became Jacob's to come up with evidence that Carlos, Jessica, or both harmed him.

### b.  Section 523(a)(6)

Jacob has failed to meet his burden.  No evidence shows the Javaleras caused Jacob's injuries.

Section 523(a)(6) of the Code excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To prevail on a section 523(a)(6) claim, an objecting creditor must prove that (1) the debtor owes a debt from an injury he caused to another entity or the entity's property; and (2) in causing the injury the debtor acted willfully and maliciously. *In re Calvert*, 913 F.3d 697, 700 (7th Cir. 2019). The first element is the critical one here. As the phrase "by the debtor" suggests, the debtor himself must have inflicted the injury. *Paulsen v. Davis (In re Davis)*, Nos. BK20-40868-BSK, A20-4034-BSK, 2021 WL 3610845, at *12 (Bankr. D. Neb. Aug. 13, 2021); *Gonzalez v. Anthony*, 538 B.R. 145, 156-57 (Bankr. M.D. Fla. 2015); *Loucks v. Smith (In re Smith)*, 537 B.R. 1, 13-14 (Bankr. M.D. Ala. 2015) (noting that the act "must be committed by the debtor himself").

*Masuo v. Galan (In re Galan)*, 455 B.R. 214 (Bankr. D. Idaho 2011), illustrates the principle. In *Masuo*, the parents of a fourteen-month-old child who died at the debtor's day care facility sued under section 523(a)(6). *Id.* at 217. The evidence at trial showed that on his second day at the facility, the child cried incessantly and refused to eat. *Id.* at 220. To console him, a day care employee put the child in a car seat, placed the car seat in a playpen, and left him unsupervised. *Id.* Because the employee failed to secure the seat, the child asphyxiated. *Id.* Still, the court found the resulting debt dischargeable. Although the debtor "was likely present" when critical decisions about the car seat and playpen were made, the parents failed to prove the debtor "physically participated in committing those acts." *Id.* at 222-23. Liability under section 523(a)(6) had to be "on account of her conduct," the court said, not the employee's conduct. *Id.*

Here, similarly, no evidence shows the Javaleras injured Jacob. Carlos and Jessica each deny injuring him, and each denies seeing the other injure him. Jacob concedes that his parents

never saw Carlos or Jessica injure Jacob, and they can name no one who did.  Although DCFS concluded that someone must have injured Jacob (because his injuries were consistent with abusive head trauma), the agency could not identify the person responsible and ultimately declared the initial abuse report "unfounded."  Despite an extensive investigation of its own, GPD, too, could not say who had inflicted Jacob's injuries and closed its investigation without charging anyone.  With no evidence suggesting an injury to Jacob "by the debtor," 11 U.S.C. § 523(a)(6), a trial in this adversary proceeding would be pointless.  Summary judgment for the Javaleras is mandatory.

Jacob, though, disagrees.  He acknowledges that "no direct evidence" shows the Javaleras harmed him, but he insists there is "circumstantial evidence."  (P. L.R. 7056-2 Resp. ¶¶ 7-8).  He cites the Lurie physician's diagnosis that his injuries were consistent with abusive head trauma.  (*Id.*).  He also notes that his symptoms began shortly after he began staying at the Javalera home.  (*Id.*).

Circumstantial, yes; probative, no.  Standing alone, the diagnosis is evidence only of Jacob's injury, not who injured him.  *State v. McClary*, 207 Conn. 233, 248, 41 A.2d 96, 103 (1988) (observing that a "diagnosis of 'shaken baby syndrome,' standing by itself, would be insufficient as definitive proof of the identity of the person criminally responsible").  As for Jacob's symptoms coinciding with his stay at the Javalera home, that would prove the Javaleras responsible only if they had exclusive custody of him.  *See, e.g., D.O. v. S.M.*, 981 So.2d 11, 17 (Fla. Dist. Ct. App. 2007) (terminating parental rights based on "shaken baby syndrome" where the evidence showed "the infant was always in the care of the mother or father"); *McClary*, 207 Conn. at 244, 541 A.2d at 101 (noting that the evidence showed "the defendant was the only person with access to the child at the critical time").  But they did not.  Between August 23 and

-8-

September 6, 2016, a period of two weeks, Jacob spent just five days with the Javaleras and then only from 7 a.m. to 3:30 p.m.  His parents or his grandmother had him the rest of the time.[5/]

With no other evidence to offer, Jacob's claim boils down to this.  Five adults had contact with Jacob between August 23 and September 6, and all deny harming him.  Of those five, his parents and grandmother are telling the truth.  That means the Javaleras must be lying and so are responsible.  Indeed, Victoria Stryjewski took this very position at her deposition:  "All I know is that it wasn't me, it wasn't Dan, it wasn't my mom; and it had to have happened in their care, so it has to be someone in that household."  (V. Stryjewski Dep. at 93, Dkt. No. 101, Ex. 2).

But a plaintiff cannot prevail at trial by asserting merely that the defendant's contrary testimony should not be believed.  *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 512 (1984) (noting that discredited defense testimony "is not considered a sufficient basis for drawing a contrary conclusion"); *Lapre v. City of Chi.*, 911 F.3d 424, 436 (7th Cir. 2018).  So

---

[5/]      Jacob also asserts in his statement of additional facts that Jessica hired a lawyer and did not cooperate with GPD.  (P. L.R. 7056-2 Stmt. of Add'l Facts ¶ 2).  But if he means to suggest that her lack of cooperation shows her guilt, he fails to argue the point in his memorandum and so forfeits it.  *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993) (failing to raise an argument in opposition to summary judgment forfeits the argument).

Jacob mischaracterizes the record in any event.  Jessica allowed GPD to interview her twice, on September 8 and again on October 19.  (Police Rept. at 4, 9, Dkt. No. 103, Ex. B).  She hired a lawyer after GPD offered her a polygraph test.  On hearing that offer, she asked if she should seek counsel and was told she could.  (*Id.* at 11).  Through her lawyer, she then declined to answer further questions.  (*Id.* at 12; *see also id.* at 14).  Jessica had a right to seek legal counsel, and in criminal cases a defendant's "selective silence" in speaking with police is generally considered to have "extremely limited probative worth."  *People v. Williams*, 25 N.Y.3d 185, 193, 8 N.Y.S.3d 641, 646 (2015); *see also United States v. Scott*, 47 F.3d 904, 907 (7th Cir. 1995).  This is not a criminal case, of course.  But an inference that Jessica harmed Jacob cannot reasonably be drawn from her decision to stop answering GPD's questions.  Since she was willing to speak to GPD before she hired a lawyer and not after, the reasonable inference is that she stopped speaking to GPD because her lawyer told her to stop, not because she was guilty.

Jacob cannot prove the Javaleras harmed him (and cannot avoid summary judgment) simply by contending that their denials of responsibility are incredible. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986); *see, e.g., See v. Illinois Gaming Bd.*, 29 F.4th 363, 369 (7th Cir. 2022); *Waldon v. Wal-Mart Stores, Inc.*, 943 F.2d 818, 823 (7th Cir. 2019). More is necessary. He had to present "affirmative evidence" that the Javaleras were responsible. *Anderson*, 477 U.S. at 257. He has no evidence.

Summary judgment "is the 'put up or shut up' moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (internal quotation omitted). Faced with the Javaleras' summary judgment motion, Jacob had to come forward with evidence that they caused his injuries. *See* 11 U.S.C. § 523(a)(6). Because he has not, the motion will be granted.

## 4.  Conclusion

The motion of defendants Carlos M. and Jessica R. Javalera for summary judgment on the complaint of plaintiff Jacob Stryjewski is granted. A separate order will be entered consistent with this opinion.

Dated: August 31, 2022

_____
A. Benjamin Goldgar
United States Bankruptcy Judge

-10-